FILED
RICHARD W. NAGEL
CLERK OF COURT

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF OHIO**
**WESTERN DIVISION**

2023 NOV 29 PM 4: 56

U.S. DISTRICT COURT
SOUTHERN DIST OHIO
W CI

| | |
|---|---|
| **UNITED STATES OF AMERICA,** | : |
| **Plaintiff,** | : |
| | : |
| v. | : |
| | : |
| **SAMUEL RANDAZZO,** | : |
| | : |
| **Defendant.** | : |

CASE NO. **1:23CR114**

JUDGE **J. McFARLAND**

**I N D I C T M E N T**

18 U.S.C. § 2
18 U.S.C. § 371
18 U.S.C. § 1343
18 U.S.C. § 1346
18 U.S.C. § 1952
18 U.S.C. § 1957

**FORFEITURE ALLEGATION**

---

**THE GRAND JURY CHARGES**:

At times relevant to this Indictment:

1.      The Public Utilities Commission of Ohio ("PUCO") was an Ohio state agency charged with regulating utility services in Ohio. According to its website, PUCO's mission was "to assure all residential and business consumers access to adequate, safe and reliable utility services at fair prices, while facilitating an environment that provides competitive choices." Under Ohio law, PUCO consisted of five public utilities commissioners appointed by the governor. The governor must designate one commissioner to be chairperson of PUCO. PUCO commissioners were selected from a list of individuals submitted to the governor by the PUCO Nominating Council.

2.      The defendant, **SAMUEL RANDAZZO**, was the Chairman of PUCO from April 2019 until on or about November 20, 2020. As Chairman of PUCO, **RANDAZZO** was an agent

and employee of the State of Ohio. In his role with PUCO, **RANDAZZO** was a "public official" who owed a duty to provide honest services to the citizens of the State of Ohio and to PUCO. Because of his role as PUCO Chairman, the citizens of Ohio and PUCO had an intangible right to the honest services of **RANDAZZO**.

3.      Prior to serving as the Chairman of PUCO, **RANDAZZO** worked for a private law firm and served as the general counsel for Industry Group 1. **RANDAZZO** was the sole owner of the Sustainability Funding Alliance of Ohio, Inc. and IEU-Ohio Administration Company, LLC.

**Background and Related Individuals and Entities**

4.      Sustainability Funding Alliance of Ohio, Inc. ("SFA") was registered in the State of Ohio in March 2010. Ohio Secretary of State filings list **RANDAZZO** as an authorized representative. **RANDAZZO** opened a bank account in the name of SFA on or about January 8, 2010, listing his home address as the business address of SFA and signing as "President" on bank filings.

5.      IEU-Ohio Administration Company, LLC ("IEU-Ohio Admin.") was registered in Ohio as a limited liability company in or around December 2003. **RANDAZZO** opened a bank account in the name of IEU-Ohio Admin. on or about March 11, 2010, listing his home address as the business address of IEU-Ohio Admin. and signing as "Partner/Member/Manager" on bank filings.

6.      "Industry Group 1" was a group of industrial energy users throughout Ohio, including members throughout the Southern District of Ohio. Industry Group 1 was created to further the interests of the individual members. **RANDAZZO** served as counsel for Industrial Group 1 from in and around 1992 to in and around January 2019.

7. "Company A Corp." was an Akron-based public utility holding company. Throughout the start of the relevant period until in or around February 2020, Company A Corp. was the parent company to entities involved in nuclear energy generation and to entities appearing before PUCO.

8. "Company A Service Co." was a principal subsidiary of Company A Corp., and operated as Company A's service company, providing legal, financial, and other corporate support services to Company A and its affiliates. Services provided by Company A Service Co. included corporate contributions and advocacy on behalf of Company A and its affiliates at the federal, state, and local levels, among other services.

9. "Company A-1" was a wholly owned subsidiary of Company A Corp. involved in nuclear energy generation. Through subsidiaries, Company A-1 owned and operated two nuclear plants in Ohio. In March 2018, Company A-1 filed for Chapter 11 bankruptcy. As a result of the bankruptcy proceedings, Company A-1 separated from Company A Corp. in or around February 2020.

10. "Company A" refers collectively to Company A Corp. and its subsidiaries. Prior to February 2020, both Company A Service Co. and Company A-1 were subsidiaries of Company A Corp. Until February 2020, all three entities shared a common first name, and members and associates often referred generically to the "company" or to the common first name ("Company A") in communications.

11. Executive 1 served in senior executive positions for Company A from approximately 2015 until October 2020.

12. Executive 2 served in a senior executive position for Company A from approximately 2011 until October 2020.

13. **RANDAZZO** signed written agreements between Company A and SFA on behalf of SFA. **RANDAZZO** also negotiated with Company A on behalf of Industry Group 1. Industry Group 1 and its members' interests at times conflicted with Company A's interests, including during proceedings before PUCO.

14. **RANDAZZO** signed written agreements between Industry Group 1 and SFA on behalf of both Industry Group 1 and SFA.

## COUNT 1
### (Conspiracy to Commit Travel Act Bribery and Honest Services Wire Fraud)

15. The allegations contained in paragraphs 1 through 14 of the Indictment are incorporated here.

16. From at least in or around December 1, 2018 through November 2020, in the Southern District of Ohio and elsewhere, the defendant, **SAMUEL RANDAZZO**, together with others known and unknown to the grand jury, did knowingly combine, conspire, confederate, and agree with each other and others known and unknown to the Grand Jury to commit offenses against the United States, namely: to travel in interstate commerce and use and cause the use of a facility in interstate commerce with intent to promote, manage, establish, and carry on and facilitate the promotion, management, establishment, and carrying on of bribery in violation of Ohio Revised Code § 2921.02, in violation of 18 U.S.C. § 1952; to devise and intend to devise a scheme and artifice to defraud and deprive the citizens of the State of Ohio and PUCO of the honest services of a public official through bribery, in violation of 18 U.S.C. §§ 1343 and 1346.

## PURPOSE OF THE CONSPIRACY

17. The purpose of the conspiracy was for **RANDAZZO** and co-conspirators to use **RANDAZZO's** position as a public official with the State of Ohio and PUCO to benefit **RANDAZZO** and Company A through bribery.

## MANNER AND MEANS OF THE CONSPIRACY

18.    The manner and means by which **RANDAZZO** and co-conspirators carried out the conspiracy included, but were not limited to, the following:

    a.  Through Company A, co-conspirators caused a $4,333,333 payment of money to SFA for **RANDAZZO's** benefit with the intent and for the purpose that, in return, **RANDAZZO** would perform official action in his capacity as a public official on PUCO, as requested and as opportunities arose.

    b.  **RANDAZZO** received the $4,333,333 payment from Company A Service Co. to SFA knowing the payment was in return for **RANDAZZO** performing official action in his capacity as a public official on PUCO, as requested and as opportunities arose.

    c.  **RANDAZZO** solicited, accepted, and received the $4,333,333 payment from Company A Service Co. to SFA in return for **RANDAZZO** performing official action in his capacity as a public official on PUCO.

    d.  **RANDAZZO** solicited and accepted the $4,333,333 payment from Company A Service Co. to SFA prior to his appointment as a public servant to corrupt and improperly influence **RANDAZZO** with respect to the discharge of his duty as a public servant with PUCO.

    e.  **RANDAZZO** used the $4,333,333 payment from Company A Service Co. to SFA for his own personal benefit.

    f.  After causing the $4,333,333 payment to **RANDAZZO** from Company A Service Co. to SFA, co-conspirators and others utilized political connections to advance

**RANDAZZO** as a candidate for a position as a public official on PUCO so that **RANDAZZO** would be positioned to take official action for Company A's benefit.

g. **RANDAZZO** discussed with co-conspirators and others specific ways that **RANDAZZO** could take official action through PUCO for the benefit of Company A.

h. **RANDAZZO** accepted and received the $4,333,333 payment from Company A Service Co. with the intent to perform official action in that role for the benefit of Company A.

i. **RANDAZZO** accepted appointment as PUCO Chairman with the intent to perform official action in that role for the benefit of Company A.

j. After his appointment as PUCO Chairman, as part of his corrupt agreement with co-conspirators, **RANDAZZO** performed official action for the benefit of Company A, as requested and as opportunities arose.

## **OVERT ACTS OF THE CONSPIRACY**

19. In furtherance of the conspiracy, and to accomplish its purpose, **RANDAZZO** and co-conspirators committed the following overt acts in the Southern District of Ohio and elsewhere:

a. On or about December 17, 2018, **RANDAZZO** emailed Executive 2 and others an announcement stating that PUCO was seeking applications for a commissioner.

b. On or about December 18, 2018, **RANDAZZO** met with Executive 1 and Executive 2 at **RANDAZZO's** condominium.

c. On or about December 18, 2018, **RANDAZZO** messaged Executive 1 and Executive 2 detailing scheduled payments from 2019 to 2024. The payments totaled $4,333,333. **RANDAZZO** added, "*Thanks for the visit. Good to see both of you,*"

to which Executive 2 responded immediately, "*Got it, Sam. Good to see you as well. Thanks for the hospitality. Cool condo.*"

d. The next day, Executive 1 messaged **RANDAZZO** and Executive 2, "*We're gonna get this handled this year, paid in full, no discount. Don't forget about us or Hurricane [Executive 1] may show up on your doorstep! Of course, no guarantee he won't show up sometime anyway.*" Executive 1 then attached an image of a venomous snake protruding from a hurricane. **RANDAZZO** replied, "*Made me laugh – you guys are welcome anytime and any where I [sic] can open the door. Let me know how you want me to structure the invoices. Thanks.*" **RANDAZZO** then added, "*I think I said this last night but just in case – if asked by the administration to go for the Chair spot, I would say yes.*"

e. On or about December 31, 2018, co-conspirators and others caused $4,333,333 to be paid from a bank account in the name of Company A Service Co. to a bank account in the name of SFA, which is controlled by **RANDAZZO**.

f. On or about January 2, 2019, **RANDAZZO** received $4,333,333 that was paid from a bank account in the name of Company A Service Co. to a bank account in the name of SFA.

g. The same day **RANDAZZO** received the $4,333,333 payment, Executive 2 messaged Executive 1:

*[Executive 1] - this text came to me this morning from Sam **RANDAZZO**. His mtg with Gov.-elect is this Friday and I suspect, absent any problem, things will go down as we've discussed, with [Individual E] getting [PUCO Official 1]'s seat as soon as [PUCO Official 1] leaves. In any event, pls see Sam's mssg re: meeting with us soon in Akron.*

*[Executive 2], I would like to come to Akron on 1/10, 1 /11, 1/14 or*

*1/15 to get a better understanding of the "hole" (size, shape, life expectancy and so on). Also, I would like to discuss a couple concepts that I landed on after our recent meeting. If [Executive 1] is available to discuss concepts, that would be a plus. If none of the above days work, get me a couple that do, please.*

h. Executive 1 responded with a date and time for meeting **RANDAZZO**, then stated: *"So you're saying Sam as Chair and [Individual E] on later?"* Executive 2 replied, *"That's their plan, but nothing certain until Sam's meeting. Four people in [State Official 1] world, you, Sam and I know about this."*

i. Later that day, Executive 2 and Executive 1 discussed the upcoming meeting between Executive 1, Executive 2, and **RANDAZZO** further. Executive 2 asked Executive 1, *"Is there anyone internally you'd like to include? I'll ask him about his location preference. My guess is that he's on point to figure out what we need and to report back as to how it should be/could be fixed."* Executive 1 replied, *"I think just you and me. Don't want too many on the inside right now. That's probably his preference also."* Executive 2 then forwarded a message from **RANDAZZO**: *"From Sam. Probably best if it is you and [Executive 1]. If more is required, I can follow up. I don't think that we will get into the weeds. That can come once we get comfortable with a conceptual framework."*

j. On or about January 14, 2019, Executive 2 messaged Executive 1 about certain Company A financial issues, namely the *"Ohio hole,"* *"extending our ESP,"* and *"fixing SEET test."* Executive 2 then messaged Executive 1 about the timing of nuclear legislation: *"Sam was talking about the number of weeks needed for him to coalesce parties on the broad construct of an energy bill. Before introduction."* According to Executive 2, **RANDAZZO** estimated *"the 6 to 8 week time frame to*

*pull together (not necessarily pass) the legislative component assumes that the new administration makes the appointment ASAP and runs from the date of the appointment.*"

k.  On or about January 17, 2019, **RANDAZZO** applied for the PUCO position commencing April 11, 2019.

l.  On or about January 28, 2019, Executive 2 messaged Executive 1 about a solution to the Ohio "hole" and an update on **RANDAZZO's** nomination: "*[Executive 1] – [Individual G] and I just finished a good meeting with Sam* **RANDAZZO** *on the way to solve the 2024 issue. No one internal knows we met with him.*" Executive 1 responded, "*Any word on his status?*" Executive 2's reply indicated he spoke with State Official 2 and, "*no decision but that he had a great conversation with Gov this morning.*"

m.  On or about January 30, 2019, in response to media reports indicating that SFA had received payments from Company A-1, Executive 1 lamented in a message to Executive 2, "*Great. Now we have none on the list.*" Executive 2 responded, "*This is awful.*" Executive 1 then messaged, "*Back to legislative fix for Ohio hole.*" Executive 1 also messaged, "*. . . Always need a backup plan.*"

n.  The next day, Executive 2 messaged Executive 1, "*Nominating Council has been delayed and is now in Executive Session.*" Later in the day, Executive 2 messaged again, "*That bullet grazed the temple.*" Executive 1 responded, "*Forced [State Official 1]/[State Official 2] to perform battlefield triage. It's a rough game.*" Minutes later, Executive 2 forwarded a message, which listed the vote totals for candidates and confirmed, "*Sam got the most votes.*"

o. On or about June 19, 2019, Executive 2 messaged Executive 1, "*Just learned that SEET will be in Senate's next budget version (which should be out today). This is significant news. Means our language is in the House passed version and will be in the Senate passed version.*"

p. On or about June 28, 2019, Executive 2 messaged Executive 1, "*Just heard from Sam.. [sic] decoupling looks good.*"

q. On or about July 11, 2019, Executive 2 messaged Executive 1: "*[Executive 1] – I had a long talk with Sam last night about audit language. He is mtg today with [Senator 4] and Senate counsel. We have a good plan to help. Just wanted u to know your team is engaged and helping – and we will get it if we can keep [Company A-1] from negotiating against themselves.*"

r. On or about July 13, 2019, Executive 2 messaged Executive 1 that he heard from **RANDAZZO** regarding "*the audit*" language, explaining, "*Sam thinks he has it nailed and the language works. Confidentially, [Company A-1 Executive B] agrees.*"

s. On July 23, 2019, the same day nuclear legislation under the name House Bill 6 was signed by the governor, Executive 1 and PUCO Chairman **RANDAZZO** had the following message exchange:

**Executive 1**                                                                              8:11 PM
       having a monument built to go in front of the plants!



Image: Image-1.jpg (235 KB)

SR   **Sam Randazzo**                                                                  8:13 PM
     Ha - I get the small space again.

**Executive 1**                                                                              8:14 PM
     Not in my book - your only one without a big head.

SR   **Sam Randazzo**                                                                  8:15 PM
     Funny.

t.    On or about November 10, 2019, Executive 1 messaged another, "*And, the [Company A] rescue project is not over. At EEI financial conference. Stock is gonna get hit with Ohio 2024. Need Sam to get rid of the 'Ohio 2024' hole*."

u.    On or about November 15, 2019, Executive 2 messaged Executive 1, "*I spoke with Sam today. Told me 2024 issue will be handled next Thursday (November 21)*." Executive 2 later that day messaged, "*he's going to make the requirement to file go away, but I do not know specifically how he plans to do it*."

v.    On or about November 21, 2019, Executive 2 messaged Executive 1, "*Today is our day for action on the 2024 issue*."

w.    Executive 2 later messaged Executive 1 the PUCO decision, which highlighted the following language from the Opinion and Order: "*we find that it is no longer*

*necessary or appropriate for the Companies to be required to file a new distribution rate case at the conclusion of the Companies' current ESP."*

x. On or about November 22, 2019, Executive 1 messaged **RANDAZZO** the image and message:



y. On or about January 9, 2020, Executive 2 messaged a message from a Company A employee referencing PUCO *"Staff's position on decoupling"* and followed up with a message stating, *"Saw your email [sic] Unreal what staff did. Of course they can't rewrite the law but now what they've done will expose all of us to what is happening. Nothing is easy."* Executive 1 later responded, *"Better get to work!"*

Executive 2 replied, "*On it. [Company A employee] is in Columbus and is going to try to see Sam later today. Also, we know Sam is coming to Akron later today to tour the new [Company A-1] building. I don't know why, but that's another opportunity.*" Executive 1 responded to the message with a "thumbs up" emoji.

z. On or about March 4, 2020, Executive 1 messaged another Company A executive: "*He will get it done for us but cannot just jettison all process. Says the combination of over ruling Staff and other Commissioners on decoupling, getting rid of SEET and burning the DMR final report has a lot of talk going on in the halls of PUCO about does he work there or for us? He'll move it as fast as he can. Better come up with a short term work around.*"

**All in violation of Title 18, United States Code, Section 371.**

**COUNTS 2 and 3**
**(Travel Act Bribery)**

20.    The allegations contained in paragraphs 1 through 14 and 19 of the Indictment are incorporated here.

21.    On or about the dates specified below, in the Southern District of Ohio and elsewhere, the defendant, **SAMUEL RANDAZZO**, aided and abetted by others, used and caused the use of a facility in interstate commerce with intent to promote, manage, establish, and carry on and facilitate the promotion, management, establishment, and carrying on of bribery in violation of Ohio Revised Code § 2921.02(B), and thereafter performed and attempted to perform acts to promote, manage, establish, and carry on, and to facilitate the promotion, management, establishment, and carrying on of the bribery:

| Count | On or About Date | Description of use of a facility in interstate commerce |
|---|---|---|
| 2 | December 19, 2018 | message between **RANDAZZO** and Executive 1 and Executive 2 relating to $4,333,333 |
| 3 | January 2, 2019 | transfer of $4,333,333 from Company A Serv. Co. bank account to SFA bank account |

**All in violation of Title 18, United States Code, Sections 1952(a)(3) and 2.**

**COUNTS 4 and 5**
**(Honest Services Wire Fraud)**

22.　　The allegations contained in paragraphs 1 through 14 and 19 of the Indictment are incorporated here.

23.　　From at least in or around December 1, 2018 through November 2020, in the Southern District of Ohio and elsewhere, the defendant, **SAMUEL RANDAZZO**, knowingly devised and intended to devise a scheme and artifice to defraud and deprive the citizens of the State of Ohio and PUCO of the honest services of **RANDAZZO**, in his role as an appointed employee of PUCO, through bribery and the concealment of material information.

**PURPOSE OF SCHEME**

24.　　The purpose of the scheme and artifice was for **RANDAZZO** to use his official position with PUCO to enrich himself and others through corruption by soliciting, seeking, receiving, accepting, and agreeing to receive and accept things of value from Company A in exchange for favorable official action for the benefit of Company A.

**MANNER AND MEANS**

25.　　The scheme and artifice was carried out in the following manner and means, among others:

　　　　a. It was part of the scheme that **RANDAZZO** received a $4,333,333 payment from Company A Service Co. to SFA knowing the payment was in return for

**RANDAZZO** performing official action in his capacity as a public official on PUCO, as requested and as opportunities arose.

b. It was part of the scheme that **RANDAZZO** solicited and accepted the $4,333,333 payment from Company A Service Co. with the intent to perform official action in his capacity as a public official on PUCO for the benefit of Company A, as requested and as opportunities arose, in return for the $4,333,333 payment.

c. It was part of the scheme that **RANDAZZO** solicited, accepted, and received the $4,333,333 payment from Company A Service Co. to SFA in return for **RANDAZZO** performing official action in his capacity as a public official on PUCO.

d. It was part of the scheme that **RANDAZZO** used proceeds of the $4,333,333 payment from Company A Service Co. to SFA for his own personal benefit.

e. It was part of the scheme that **RANDAZZO** accepted appointment as PUCO Chairman with the intent to perform official action in that role for the benefit of Company A.

f. It was part of the scheme that, before and after his appointment as PUCO Chairman, **RANDAZZO** communicated with Executive 1, Executive 2, and others about official action from PUCO for **RANDAZZO** to perform and cause others to perform for the benefit of Company A.

g. It was part of the scheme that, before and after he received appointment as PUCO Chairman, **RANDAZZO** concealed his receipt of the $4,333,333 payment for his benefit from Company A Serv. Co.

h. It was part of the scheme that, after his appointment as PUCO Chairman, as part of his corrupt agreement, **RANDAZZO** performed official action for the benefit of Company A, as requested and as opportunities arose.

## USE OF INTERSTATE WIRES

26. On or about the dates specified below, in the Southern District of Ohio and elsewhere, the defendant, **SAMUEL RANDAZZO**, for the purpose of executing the above-described scheme and artifice to defraud and deprive, caused to be transmitted by means of wire communication in interstate commerce, the following writings, signals, and sounds:

| Count | On or About Date | Wire transmission |
|-------|------------------|-------------------|
| 4 | December 19, 2018 | message between **RANDAZZO** and Executive 1 and Executive 2 relating to $4,333,333 |
| 5 | January 2, 2019 | transfer of $4,333,333 from Company A Serv. Co. bank account to SFA bank account |

**All in violation of Title 18, United States Code, Sections 1343 and 1346 and 2.**

## COUNT 6
### (Wire Fraud)

27. The allegations contained in paragraphs 3 through 14 of the Indictment are incorporated here.

## THE SCHEME

28. From in or about 2010 through in or about March 2019, the defendant, **SAMUEL RANDAZZO**, in the Southern District of Ohio and elsewhere, knowingly devised and intended to devise, a scheme to defraud, and to obtain money and property by means of materially false and fraudulent pretenses, representations, and promises, and in furtherance of the scheme used and caused to be used interstate wires.

29.     The purpose and object of the scheme and artifice was for the defendant, **SAMUEL RANDAZZO**, to enrich himself by defrauding Industry Group 1 and its members out of money and property by means of materially false and fraudulent pretenses, representations, and promises.

**MANNER AND MEANS**

30.     The manner and means by which the defendant, **SAMUEL RANDAZZO**, sought to accomplish his objective, included the following:

a.  It was part of the scheme that the defendant, **SAMUEL RANDAZZO**, controlled Industry Group 1 bank accounts and Industry Group 1 bank account statements were sent to either his home or office.

b.  It was part of the scheme that the defendant, **SAMUEL RANDAZZO**, entered into agreements and arrangements on behalf of Industry Group 1 and its members, which resulted in companies making payments ("settlement payments") to Industry Group 1 and its members.

c.  It was part of the scheme that the defendant, **SAMUEL RANDAZZO**, kept money intended for Industry Group 1 and its members for himself.

d.  It was part of the scheme that the defendant, **SAMUEL RANDAZZO**, sought to conceal his embezzlement scheme from detection in a variety of ways.  For example, at times, **RANDAZZO** disguised the source of the settlement payments by funneling the money through entities he controlled and through various bank accounts that he controlled prior to distributing the payments to Industry Group 1 members.  **RANDAZZO** also concealed the total payment amount received by splitting payments upon receipt and routing them through various accounts that he controlled.  **RANDAZZO** also concealed from Industry Group 1 members that he

was keeping portions of settlement payments for his own use and benefit. **RANDAZZO** also controlled and limited the information he provided to members regarding the settlement payments of other members. In addition, **RANDAZZO** created a fictitious member of Industry Group 1 that received payments along with legitimate members.

e. It was part of the scheme that when the defendant, **SAMUEL RANDAZZO**, ended his relationship with Industry Group 1 and became a PUCO public official, he transferred money to various accounts to conceal his embezzlement.

## USE OF INTERSTATE WIRES

31. On or about March 7, 2019, in Southern District of Ohio and elsewhere, the defendant, **SAMUEL RANDAZZO**, for the purpose of executing the scheme described above, and attempting to do so, caused to be transmitted in interstate commerce, by means of wire communications, certain signs, signals and sounds, to wit, the transfer of approximately $1,104,598 from Wells Fargo account x5797 to JPMorgan Chase Bank account x1600.

**All in violation of Title 18, United States Code, Section 1343.**

### COUNTS 7 to 11
### (Illegal Monetary Transactions)

32. The allegations contained in paragraphs 1 through 31 the Indictment are incorporated here.

33. On or about the dates specified below, in the Southern District of Ohio and elsewhere, the defendant, **SAMUEL RANDAZZO**, did knowingly engage in a monetary transaction in criminally derived property of a value greater than $10,000, all involving financial institutions which are engaged in, and the activities of which affect interstate commerce, such property having derived from a specified unlawful activity, that is, an act of bribery, which is

chargeable under State law and punishable by a term of imprisonment exceeding one year, in violation of Ohio Revised Code § 2912.02; wire fraud, in violation of 18 U.S.C. § 1343; honest services wire fraud, in violation of 18 U.S.C. §§ 1343, 1346; and Travel Act bribery, in violation of 18 U.S.C. § 1952(a)(3), as follows:

| Count | On or About Date | Monetary Transaction |
|---|---|---|
| 7 | January 3, 2019 | Deposit of $100,000 check into account x4786 from account x9838. |
| 8 | January 14, 2019 | Deposit of $40,000 check into account x4786 from account x9838. |
| 9 | February 25, 2019 | Deposit of $25,000 check into account x4786 from account x9838. |
| 10 | March 5, 2019 | Deposit of $730,000 check into account x4786 from account x9838. |
| 11 | March 11, 2019 | Deposit of $90,000 check into account x4786 from account x9838. |

**All in violation of Title 18, United States Code, Sections 1957 and 2.**

**FORFEITURE ALLEGATION 1**

Upon conviction of any of the offenses set forth in Counts 1 through 6 of this Indictment, the defendant, **SAMUEL RANDAZZO**, shall forfeit to the United States, pursuant to 18 U.S.C. § 981(a)(1)(C) and 28 U.S.C. § 2461(c), any property, real or personal, which constitutes or is derived from proceeds traceable to the violation(s) including, but not limited to, a sum of money equal to the amount of proceeds the defendant obtained as a result of the offense(s).

**FORFEITURE ALLEGATION 2**

Upon conviction of any of the offenses set forth in Counts 7 through 11 of this Indictment, the defendant, **SAMUEL RANDAZZO**, shall forfeit to the United States, pursuant to 18 U.S.C. § 982(a)(1), any property, real or personal, involved in such offense(s), and any property traceable

to such property including, but not limited to, a sum of money equal to the amount of money involved in the offense(s).

## SUBSTITUTE ASSETS

If any of the property described above, as a result of any act or omission of the defendant:

a.      cannot be located upon the exercise of due diligence;

b.      has been transferred or sold to, or deposited with, a third party;

c.      has been placed beyond the jurisdiction of the court;

d.      has been substantially diminished in value; or

e.      has been commingled with other property which cannot be divided without difficulty,

it is the intent of the United States, pursuant to 21 U.S.C. § 853(p), as incorporated by 28 U.S.C. § 2461(c) and 18 U.S.C. § 982(b)(1), to seek forfeiture of any other property of the defendant, up to the value of the property described above.

**A TRUE BILL**

_____
**GRAND JURY FOREPERSON**

**KENNETH L. PARKER**
**UNITED STATES ATTORNEY**

_____
**EMILY N. GLATFELTER/ MATTHEW C. SINGER**
**ASSISTANT UNITED STATES ATTORNEYS**